the court, Tom Brandt for Officer Kevin Bruner. Officer Bruner acted reasonably when he took a minor child into temporary protective custody for several hours until he could find a responsible adult to take care of the child. It is important to remember that when Officer Bruner took the minor child into protective custody, he was not taking the child away from a parent. He was not taking the child away from a parent who had custody of the child. Far from it. What he was doing was he was removing a child from an empty apartment. He was removing a child in his judgment while he was conducting an ongoing criminal investigation. He took her for her safety back to the school to interview. You do or don't dispute that for the seizure of the child, it was a seizure, to be reasonable. It had to either have a court order, parental consent, or he was facing exigent circumstances. Is that right? And you're putting this in the exigent circumstances? I'm putting it actually more in the community caretaking function, but exigent circumstances is described by the case law and including the most recent statement by Justice Kavanaugh. Part of what troubled me just factually here, according to the allegations, is opposite to requesting parental consent to remove what may have been an endangered child. The allegation is that Bruner refused to allow the child to speak to the parents. Yes, and you have to understand the context there, because what's happening is, first of all, the report comes from a counselor saying, giving information to Officer Weaver saying that these children have been left, this child is left alone. Then she reports that to Bruner, so he's getting reliable information that leads him to the the reasonable belief, reasonable suspicion, that there's a possible crime of child abandonment or endangerment. He then begins to act with Bruner, and with Bruner and Weaver go to investigate. And this is, so that's the context. There is a reasonable suspicion for the officers to act in the best interest of this child. When they arrive, the child does say the neighbor had just checked on them, correct? So Bruner's aware. As they go through, they find out that every other person they talk to says that the neighbor had not just checked. That was the previous evening. Right, but at the moment of seizure, when we assess the reasonableness of it, the child did say, my neighbor checked on me a couple hours ago. Yes. Said they'd been over that morning. Yes, that's what, that was, that was what was told to the officer. And then the officer makes the seizure decision before or after talking to the neighbor. Before. And what conceivable justification is there for that? The conceivable justification for that is that he doesn't want to leave the child alone in the apartment while he continues to go, while he goes on to investigate where the other child is and find out more about the situation. But why, why not find out, what conceivable law enforcement justification is there for not asking the neighbor or trying to talk to the neighbor or talking to the dad? Now if. Any of them. That's, that's a legitimate question, but the question that you're asking essentially is second guessing the wisdom of the officer's decisions at the time. No, no, no. With regard to what could he have done better in this circumstance? No, no. Second guessing would be saying here are two different things that the officer could have done and I personally as a federal judge think it should have been this, not that. What I'm asking you is a different question, which is with the benefit of hindsight and representing your client, what conceivable justification could there possibly be in any set of circumstances for not talking to the neighbor, talking to the dad, allowing the daughter to talk to the dad? In your view, what do you think it could be? I'm not asking you to guess which one's better. There is two things. One is convenience for the investigation and that's what he said. It would be more convenient if we get these people together and he did talk to the Vallejos and they said, he said they wanted to meet in person. He said, let's, for convenience purposes, let's all go over to the able. There's no fourth amendment basis. You can't see someone because of your convenience. I guess I'm a good judge. What's your second one? What's the exigency here? Exigency here is this. And it comes from a common sense approach, knowing that this is an investigation for child abandonment or endangerment. Just as when a person goes to take their child to the emergency room for a medical emergency, a broken arm, it is commonplace for the doctors, the medical professionals to break the connection between the parents because the parents are in that circumstance possibly a suspect of the child. And the little girl wants to talk to her dad and he won't let her do it. And yes, because, because the parents are suspects and what he's doing is trying to, and this is a common thing. You've already jumped to the fact that the parents are suspect when they have nothing on the face to suggest that. Well, the information that officer Brewer had with him at the time was that they had been left alone in the apartment and that they were overseas. They were in fact five days in Kuwait. That's where they were. That's the information he had at the time was the neighbor just checked on her. So let's change, let me ask you a hypothetical question. Suppose an officer knocks on the door and the 14 year old girl says, oh, my parents went out to the grocery store and the officer says, I don't believe you. So get dressed. I'm taking you down to the high school that you don't attend. You cannot talk to the neighbor. You cannot talk to your dad. I'm going to hold you incommunicado while I investigate for the convenience of my investigation, whether in fact you're being endangered. There's no evidence of it. No one, there's no evidence of self-harm. There's no evidence that there's no food. There's no evidence of alcohol. There's no evidence anything's going wrong, but I'm going to hold. Is that reasonable? Can the officer do that? No, I don't think that. And why is that? What is the difference between the case I just gave you and this one? This one, the mother was indicted. Yeah, but that was months after the seizure, right? I mean, the timeline, the timeline was that he submits the affidavit that leads to the indictment months later, correct? No, it was the next month. It was from October to December. So October, late October 26th through to December 8th. Well, so is your answer not, I can identify that there was some self-harm or there was some abuse, there's some exigency recognized in the case law. Are you shifting now to, well, she was indicted and therefore the grand jury ratified as reasonable what your client did? Is that what you're arguing when you say she was indicted? Are you slipping to the independent and intermediary doctrine? Well, I am asserting this independent and intermediary doctrine, but in answer to the direct question, what possible reason would you have for that? It is the just, on the spot, in the field, decisions of an officer that can be wrong, it can be unwise, but it's not a violation of the fourth amendment. That's my point first. Second, it is an independent and intermediary. Do you agree that clearly established law says you have to articulate some exigency, abuse, self-harm? You haven't yet described any other than the convenience of the officer. But the case law says to remove the child from the parents, it requires exigency. The child was not removed from the parents. The parents weren't there. There was no... Yeah, that's sort of, I'm not sure I see that in the case law, and frankly, that seems to compound the problem because he then blocks the child from speaking to the parents. But anyway, I think I hear your argument. I don't, my colleagues may want to go back to this, but if you could get to sort of our tricky world of law around the independent and intermediary doctrine. Yes, and admittedly, it is a tricky area. And I think that what I've seen is that this court has moved in one direction where the Supreme Court has been stayed in another. Quite frankly, I think the Supreme Court has been very, very, very clear on this. An indictment is, by a grand jury, seals the deal. It says there was probable cause, period. There's no second guessing. There's no going back. But there has been a robust area of case law in this circuit that has been second guessing grand jury decisions. I think that's improper. Well, it's not second guessing. The law, which is a fair bit of it, is saying that at the motion to dismiss stage, since grand jurors are essentially inherently secret, there's no way that somebody would know whether the grand jury was tainted. So the case law we're saying is not sort of disregarding grand juries. It's saying you at least, there's a fact dispute here. They've alleged that your client tainted the grand jury. No, that's not, there's no Frank's claim made in this case. But just assume there was. Assume there were a Frank's claim made. Well, they have plausibly alleged that your client didn't, both omitted relevant material information and added incorrect information. For example, omitting that the neighbor had said, the child said, neighbor just visited me. You have in the record the probable cause affidavit from the office. Yes. And it's there what he says exactly. And there's no allegation that he made a false statement. And the omission that he's supposedly made, you also see where he tried repeatedly to contact Mrs. McMurray and the lawyer and try to get their story and then said, okay, I don't have, they won't respond to me. I will submit this to the prosecutor and they'll do what they want with it. Okay. Stepping back, when you say Supreme Court's in one position and you think our laws may be in tension, you acknowledge McLin, Winfrey, Wilson, all in the last four years have said that when there's a plausible allegation of a taint, qualified immunity shouldn't allow for dismissal. So you're saying that law is incorrect or you think you prevail under our law, Fifth Circuit law? I think I prevail under both, both Fifth Circuit and Supreme Court. And I'll tell you why. First of all, Supreme Court and most recent, there seems to be a disconnect because the Supreme Court has come out with cases and saying, okay, federal courts, you're not to be second guessing. You know, U.S. versus Williams comes out and says exculpatory evidence does not need to be presented to a grand jury. Yet this court says you don't, in Winfrey, you didn't give exculpatory evidence or in other cases. The independent intermediary doctrine is not a Franks or Malley case, right? It is not a standalone claim. What is not? The inter, independent intermediary taint doctrine. That's just saying you cannot rely on the grand jury or the DA to break the causal chain. Yes. It's a, that's why I started with reasonableness. It's the Fourth Amendment. There is no such thing as a Franks claim. There's no cause of action. I agree, but that doesn't, that doesn't resolve whether or not they've, there are disputed issues of fact as to whether your client tainted the grand jury. But the district court said the only reason that, that the only reason the district court gave for disregarding the indictment was to say it's number one, not relevant, which is a remarkable thing to say. Number two, it's not relevant because, and what the because is, it says because there was some possible investigation after the affidavit, after the probable cause affidavit. Okay. But our law says, but the law says if they plausibly allege that all facts were presented to the grand jury, that gets past the motion to dismiss stage. Yes, but that comes from Hand v. Gary, which predated. Yeah, but that was, it was reiterated in McClin. It was reiterated in Winfrey. It was reiterated in Wilson. But going, but going back to what the district court did here, the reasoning it gave was it said the reason I, it said the reason I am not going to allow you to use the independent intermediary doctrine is because after the decision was made, there was more investigation that went forward to, to indict. And that's a remarkable statement to make because if there's more investigation and then there's a grand jury indictment, that would indicate that there was a complete independent intermediary. There's no, there's no allegation here that there was an intentional taint of the grand jury process. None. This is a situation much in the, in, in, in the Cayley decision, the Cayley v. U.S. This is where the Supreme Court has said, you cannot second guess grand juries. And I understand, Your Honor, that there is a, there is an active line of cases, McClin, Winfrey. I understand those cases. I've looked at them carefully and I think that quite frankly, they've extended Franks well, well, well beyond anything it was ever intended to be. It was meant to be a very limited thing in which they say, Delaware, you don't have enough procedural protections. You have a bar. You won't let veracity hearings occur. And, and so all that needed to be happening there was, Delaware, get your act together. Texas has its act together. Texas gives you examining trials. But if you are, if you are arrested for a felony in Texas, you have the absolute right to get an examining trial to test that veracity. So in that regard, Franks doesn't apply to felony arrests in Texas because you have the procedure available to you before indictment. And then after indictment, you also have procedural protections available to you in Texas law. I asked you a lot of questions on this, but your time's up. Do you want to give a summation statement? I know you have rebuttal time. Do you want to just save the rest for rebuttal? Yes, Your Honor. Okay. Thank you, counsel. Good morning and may it please the court. My name is Peter Bagley and I represent Megan McMurray and Adam McMurray. You asked about the conditions or the conditions of the premises of the McMurray's home when there was the removal that occurred that appellant's counsel had spoken to. I'd like to just put out the scene of that because the affidavit for problem caused, that is the expression that appellant composed. That is the expression of his understanding of exigent facts. And all you have to do is look at the first four paragraphs of his affidavit for probable cause. If you look at those four paragraphs at the end, that is the point of removal where they take McMurray's daughter from the apartment, they take her to an apartment office, and  I don't want to go through all the facts that we've talked about in the pleadings, but I would say that at that juncture, when the officers were conducting their welfare check, they already knew adults had some kind of level of engagement or involvement with the kids. They might have deemed it to be insufficient, but there was at least some level of involvement. They knew that the son had been driven to school. They knew that neighbors, friends were checking in on the children. We know from the affidavit that the colleague went into the apartment. She came out. She didn't say anything negative about the conditions of the home. She didn't say there was lack of resources. So it's against this backdrop that the most the officers could have perceived was that the daughter would continue. She's 14 years old, by the way. She would continue to remain in the home during the course of the day in presumably inadequate, if not comfortable apartment, just doing her online instruction. Later in the day, the son would be coming home from school. They would have known that later in the day, the neighbors would be coming home from school. And then perhaps that evening, they could have surmised that the children were planning on spending the night in the apartment by themselves while their neighbors went back to their own apartment in the same complex. That scenario I just described, I would suggest to you, could not have made the appellant and his colleague reasonably think that the situation was so imminently dangerous that they were forced to act at that moment in time. The situation might have created an understanding that maybe we need to check this out further, do some further inquiry, maybe even leaving the door open for some protective measures later if they receive some other information that might suggest that. But certainly not the action of removing the daughter from the home at that moment. Let me tell you my two concerns. One is about what's the clearly established law you're relying on. And then the second is, of course, getting back into the thicket of the independent intermediary doctrine. So the first is, if we all agree we do want to make sure that protective services can protect abandoned children, as in hot cars, or even in a home where you're worried a fire might start, what is the law that gave fair notice to Officer Bruner that what he was doing was unreasonable, seizing the child from a home, child alone, no parents in the picture? I would be most grateful if you start with the case you most rely on to give him notice he couldn't do what he did. There's two cases. I think they kind of go hand in hand from this court. It's Gates versus Texas, Wernicke versus Garcia. OK. That's 2008. And then— So that does turn on our court's ability to establish clearly established law. Yes, sir. Yes. Yes. And those cases have said in child abuse, child endangerment, or something of that nature that you can only have those three conditions that you spoke to earlier, one of them being exigent circumstances. And that is the heart of this case, is whether we have sufficiently pled that there were no exigent circumstances. What if the officer's response is, I'm just worried there's going to be a fire in the house? He might think that, but he still had to be guided by that law. And he might have acted out of sincere, shall I say, like maybe concern for the child. But we have to be able to say every reasonable officer would think child peeking around doors saying mom and dad aren't here can't remove the child. OK, to your question. So he could have been concerned about a fire, but there was no fire when they were there that day. So he could only surmise there might be a fire. And that is not something that's imminent. That's not urgent. That's not emergency. And I think every reasonable officer would have thought what they would have needed to do in this case is they would have thought, we need to slow down. We need to like check this out, take a, you know. But slow down meaning not remove child. Not remove the child. So would a car be different? Let's say they did go to the grocery store and they did take the children, but then the parents both go into the grocery store, leave children in the car. Can the police, is it reasonable to seize those children? Of course. Because of the heat. Sure. But not out of a house. Out of a comfortable home. No hazards. No weapons. No controlled substances. But can they search the house for the weapons? I'm not saying they did that. I'm just saying that's what you see in the case law sometimes. I'm very sympathetic. I'm just really, you think Gates and Warneke establish and fairly notify so these officers who we do want to protect children that are abandoned, wherever they're abandoned, would know, but this case was different. This case, you couldn't remove them to figure out what's going on. They would have known she was not in an urgent situation. And so they would have maybe conducted more investigation to find out if they needed to. Get a court order, speak to the parents. Absolutely. Speak to the parents, speak to the neighbors, speak to the daughter even. We said clearly established law at a very high bar. So police officers or whomever, protective officers, really there's no doubt at all. The no doubt at all rule you're saying here is child found home alone may not remove unless what? Unless there was something about the conditions of the home that suggested there was a problem. That you wouldn't want to leave a 14-year-old at home. By the way, 14-year-olds can work in the state of Texas. They can get jobs. And they can do a lot of things. Is it unreasonable to think that a parent might want to leave their 14-year-old at home just to do online instruction or anything else? That is not a strange situation. Are you prepared to tell? Is there a robust consensus of other circuits in agreement with that to make the seizure reasonable there has to be some articulable exigency? This court. This court. You've cited the cases in this court. I'm just wondering if there are any other circuit in this area. This would seem to come up fairly often. Children found alone. And I think that's discussed in those cases that I've mentioned. Gates versus Texas and Wernicke versus Garcia. They talk about how other circuits have dealt with these things. And they kind of use some different language. But it's kind of the same thing. Is there some immediacy that demands attention at that moment? Not to slow down. Let's investigate this further. Go off. Talk to some of the principal players. Get some more information. And then maybe they might have decided they heard something really negative. We'll go back. We need to get her and take her. But I have to say realistically in these kinds of matters, they don't normally, police officers, like Child Protective Services were doing this, they would not have seized her and put the children into foster care. They would have come up with a care plan or look for somebody who could take care of the kids temporarily until the parents came home. Part of my pressing opposing counsel on the independent intermediary doctrine is it's difficult to say officers in the split second or even on the same day making a decision lack qualified immunity when months later a grand jury and maybe a DA both look at the same evidence and say, we're going to indict. And they obtain an indictment. So what I'm concerned about is why don't those subsequent actions ratify at least the reasonableness of this officer? Well, a couple things. One, the Megan McMurray who was charged with the crime of abandonment, the crime that applied to her was found in the Texas Penal Code 22.041B. That crime does not have as one of its elements immediacy or urgency. So if the grand jury thought there was probable cause to get there, they would not have contemplated It would be irrelevant to the Fourth Amendment argument. That would be, in that equation Did you make that argument in the brief? I did not. Unfortunately, I wish I pushed that a little bit harder. You probably read the cases. Buhler is the one that I'm concerned about where we did say, well, you'll get qualified immunity unless the plaintiff can point to material misleading of the grand jury. So what would you say looking at Bruner's affidavit was the material misstatement of something exculpatory? What would you point to as something he did that really tainted that grand jury? Well, one, he said that the visitation was only once a day. And I don't know how he came to that conclusion, but it's in his affidavit. And he said he spoke to the neighbors. They weren't planning on just visiting the children once a day. That morning, they didn't visit them. That is true. That Friday morning, which was less than 24 hours after Ms. McMurray had left town, they had just gone off to work, maybe because they were in a hurry or something. But that was not indicative of somehow Bruner thought that was going to be the pattern for every day Ms. McMurray was gone. He didn't say that he didn't indicate in the affidavit that he failed to talk to Mr. McMurray, the father. Even when the father, that the father had actually tried to call and speak to the police officers, and he declined to speak to them. So that's telling that why would you not speak to the father if he's one of the parents? They omitted that fact. Absolutely, absolutely. It's not an omission, but they say in the affidavit that Megan McMurray called from overseas and spoke to Officer Bruner. When he had that conversation with Ms. McMurray, he doesn't ask her any questions about the caretaking arrangements in that conversation for some reason. What happened to the grand jury indictment? Well, they indicted Ms. McMurray and then it led to a criminal charge and they had a whole criminal trial and she was acquitted of the crime of abandonment. So, the other thing was he omitted the fact that when he had talked to Child Protect Services, he omitted the fact that he had not even talked to the caretakers about the caretaking arrangements. Did he describe that he had blocked the child from speaking to them? No, that's not in his affidavit. That's pretty significant. Yes, absolutely, yes. Also, it's interesting that in his affidavit he says that he talked to a Child Protect Services official and he told them before even talking to the caretakers or the parents that he was going to take the children to the junior high school for convenience, maybe convenience for him because that's where he worked. But, at any rate, he didn't. So, he omits the fact that he is already making a decision about removal to the junior high before even talking to any of the primary players. And I don't know if that would have registered with the grand jury. I mean, it's, you know, I don't know if he actually states outright false information in the affidavit, but it's certainly, you have to really read it very carefully and understand the... What is this officer's primary assignment and responsibility at the time? At this time? No, at that time. Well, that's an interesting question because he's, it sounds like they say they're doing two things at the same time. They're investigating a crime, as appellant's counsel has just argued, which for me, if that's what you're doing, you... Why was he called to the scene? What's his assignment? Uh, he was called to the scene because his, the colleague of the appellant told him that she had spoken to a teacher who said the children were home alone. Now, that statement didn't... Was he a police officer or is he a... Oh, I get it now. He is, they're both police officers of the Midland ISD school, Midland Independent School District. Officer Weaver is the person who got this information and Lieutenant Bruner is her superior. So when she received this information, she spoke to Officer Bruner, she notified Mr. Bruner. He came to the school and they started talking to some employees. So, but going back to what I was saying was, if they're investigating a crime, they wouldn't need to seize, you don't need to seize children for a crime. If they're conducting a welfare check to see, oh, mom has gone overseas, maybe we ought to just check in and see if everything's okay. If you remove somebody, then you got to have that exigency because then you're... Some imminent danger. Right. You're engaging in some sort of protective role. And, um, so to me, comparing the investigation of the crime or, uh, you know, taking custody to undertake a criminal investigation versus the protective measures that a cop would take, I think those are two different functions and it's kind of an apples and oranges comparison. But how does Child Protective Services dial into this, these transactions? The first officer, Officer Weaver, called Child Protective Services. When? She made a phone call from the school before they even got to the apartment. Then they get to the apartment and my understanding is they're in the apartment complex office and, uh, Lieutenant Brunner calls, uh, an official from Child Protective Services, somebody he actually knew. That's not in the record, but they were friends. And he was, he was just telling him, look, I think maybe for convenience, I'm just going to take, uh, the daughter over to the junior high school. So, um, now they claim in the affidavit... In his affidavit that he did it for his own convenience? For his, for convenience. That's what, that is in the affidavit. Now he claims in the affidavit that the CPS official said, uh, something like, okay, that, uh, no, he, he asked if it was likely that they were going to be taking possession of the children and, or custody of the children. And the CPS official said it was likely that they were going to do that. Now, I would find it astounding that a Child Protective Services official would say this on the mere basis of a telephone call. Because under the Texas Family Code in 262.001, there's this, there's all this information about how social workers have to take reasonable steps to prevent or eliminate the need to remove a child from a home. So I, I, you know, is it possible he said that? Or is it possible the CPS official didn't understand what he was, what Lieutenant Brunner was saying to him? I don't know. But I would, I would find it astounding if he just said... That's what puzzles me. I'm familiar with the Child Protective Services. We're all, this court's very familiar with that. Yeah. That whole concept and the way it's administered. They, uh, it seems very awkward to me that it's just, it doesn't sound like Child Protective Services. It's, it's, and my question is what was their role in it? That's the primary state agency that deals with this. Absolutely. And they did come to the school district where by now the two children are there because the son had gone to school. The daughter was taken to the school. They come in, talk to the neighbors. They contact Ms. McMurray by telephone because by then she'd already landed. She was flying to Kuwait. She landed. She was able to communicate with them by phone and they clear her. All's good. Time to go home. We don't know what this is all about. They close the investigation. That's what they do. Yes. That day. Six weeks later, Officer Bruner submits his affidavit for probable cause because he wants to continue this criminal prosecution. What does it suggest? He wants to continue the investigation or he wants cover? I don't know. I, I, I don't dare speculate. But I'm, it's puzzling that the role of Child Protective Services and exactly what his assignment is. Well, that, that's true because it seems like he was. Child Protective Services had closed the file. Now you, this officer still wants to go forward and pursue this thing. Right. As, as a criminal investigation against Ms. McMurray. As a police officer. He now says, although Child Protective Services does close their file, he wants to prosecute. Right. Right. And. The DA took that. They did. Very puzzling. Um, I see I'm getting short on time. I want to make one comment if you. Well, you know, you're nice to put it that way. Thank you. The only, of course, in the brief you saw opposing counsel puts a great deal of emphasis on Justice Kavanaugh's remark. Is that where you were going? Yes. And, and that sort of loops back into, do you have any authority that says that we, the Fifth Circuit cases you've cited can establish clearly, we set clearly established law as opposed to the Supreme Court? Do you see the two as, as connected or do you want to answer each separately? Well, first of all, Justice Kavanaugh was speaking in a concurring opinion. Yeah. So it doesn't have presidential value. I think he was doing a thought experiment about situations where you could go into a home without a warrant because of, to conduct an entry without a warrant because of some emergencies. So that, that was about entries, not about removal. And one of the examples he gave was a situation where there might be young children at home unattended. To me, that implied young meant infants or toddlers or somebody who would require constant To be clear, we have this parallel situation of child protective services is now out of the case and now it is closed. And then we have another independent prosecution of the parents here. The effect of which, if successful, would be obviously to enforce, the child would certainly need child protective services or some other at that point. They actually operate completely. I mean, there's coordination and overlap, but they, if child protective services closes an investigation, it doesn't impede the ability of police to still prosecute something. I'm just concerned about the objective of prosecuting and I don't understand what's going on here. The question is whether or not that these, these parents are taking care of their children, that children should remain there. That's what it amounts to. And the state agencies to whom the custody would go, they would go into that child protective services program. In extreme situations, yes. But otherwise, they would normally do like, I see that amount of time. Well, once you finish the thought you had before that you were going to make the remark as to the Kavanaugh and robust consensus. So in that, in that concurrent opinion, Justice Kavanaugh, when he was laying out those examples, he, he, he proceeded that with a statement that said, these might be some situations that could be emergencies. And these would be situations where it'd be reasonable for officers to act and it would be reasonable in a crisis to believe there is a crisis for which it's reasonable to act. So I'm using Justice Kavanaugh's words. So he's laying out the scene that these would be situations of crises and that it would force the officer's hands to react now, then and now. And then, then he goes into his examples, like an elderly person who's, who's injured at home. That's wonderful. Thank you, counsel. Thank you for your time. A rebuttal argument? As Judge Higginson, you pointed out, the question about clearly established law has never been clearly defined by the Supreme Court in that they have never said that a lower court, intermediate court could establish law. They've always reserved that question. So then you have the question, okay, in the practical world, the, the decisions of the circuit have been acted upon as clearly establishing things. But then you have a Supreme Court decision that says that's not necessarily what establishes the clearly established law. Then you have Justice Kavanaugh opining in a concurrence, something that is enough of a question mark to leave an officer who is not a trained lawyer, not a judge. But I didn't see your brief to dispute that the clearly established law you understood exists, no circuit is disagreed, is that to actually seize a child out of their home, there has to be an imminent danger to the child. Do you dispute that that is clearly established Fourth Circuit, Fourth Amendment law? I dispute it because the fact of the matter is the, the, the, the statute, the Texas statute that he was talking about, that, that this was acted upon, talks about unreasonable risk of harm. That's what, if, if, if an officer thinks that somebody has an unreasonable risk of harm left alone, that ties in straight with what Justice Kavanaugh said. When did Justice Kavanaugh write the statement? What year? What year? When did Justice Kavanaugh write that statement? It was in 2021. And when did Officer Bruner seize the child? 2018. Great. So it's irrelevant. There's no way that Officer Bruner would have known anything about what Justice Kavanaugh had to say. And Justice Kavanaugh says nothing about seizing a child. Let me ask you a very specific question. What procedural protections, in Officer Bruner's view, does a parent in Texas have against the seizure of their child from their home? What is the quantum of procedural protection? An examining trial. It was an examining trial given before Officer Bruner took this child? Examining trial can be given if it's asked for. It is the— Did Officer Bruner call the parents and say, would you like an examining trial before I seize the child from your apartment? No. The examining trial occurs after any kind of arrest. But this was not an arrest anyway. We weren't prosecuting— Let's go back to my question. What is the—parents have a procedural due process claim. You seized my child from my home without according me due process. And so my question for you is, what procedural protections does Texas give the parents before they seize a child from the parent's home? In the circumstance when the parents are nowhere to be found, procedural protections occur after the— So none. In the context of custody— No pre-deprivation procedure. There's post-deprivation remedies that are available. But there are also pre-deprivation remedies that, if you notice, first of all, there has been no misstatement of fact. That's what counsel Hobson said, there's no material misstatement by Officer Bruner at all. But you can get to that at summary judgment. But what I'm trying to understand is, before a police officer takes a child out of a house owned by the parents, what procedural protection will the officer give those parents? And I'm understanding you to say none? Well, the Fourth Amendment reasonableness of the community caretaking function, as it's been explained by the Supreme Court, allows officers to have community caretaking functions to seize someone for safety, for convenience, for investigation purposes. All of that is fairly vague, but it is—that is my point. It is fairly vague, which means— That's astonishing. That's an astonishing answer, that you can just seize the child without a text message, a phone call, anything, literally anything. When you have other evidence that there has been an abandonment, you have it from other reliable—it's not he's making an on-the-spot decision without any background. He's been told by the school counselor, these kids have—this child has been abandoned. He has a statement— That information is given to him. He has a statement from a school counselor. And by his co-worker, the officer Weaver, who had talked to the counselor. Officer Weaver then communicates to Bruner, and according to the plaintiffs, she miscommunicated to Bruner, but Bruner was entitled to rely on what Weaver was saying, so he's got in his mind, I've got an abandoned child that I've got to investigate. That's the situation. But I would like to address, if I could, why Kavanaugh's statement is not irrelevant. Because in qualified immunity terms, when the law, when later court decisions come out, it has always been the case that those decisions can make clear that the law was not clear at the time. They can never clarify the law against the officer, but they can clarify the law in favor of the officer, where they can say, well, certainly if it's not clear in 2021 for Justice Kavanaugh, then it couldn't have been reasonably clear in 2018 for a lowly officer. That's why this is not an officer who is plainly incompetent or knowingly violated the law. He was not on fair notice. Gates and Wernicke do not. I know, I let him go a little long, so just go ahead and wrap it up. Gates and Wernicke are distinguishable. And then when you see what happens at the Supreme Court, you also see not only the indictment, but you see the prosecution. It went to a full trial. Thank you both. The case is submitted. We have one more case for the day. Are you okay to keep going?